UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-80239-CIV-ROSENBERG/Reinhart

EDWARD FAGAN,

　　　　　　　　Plaintiff,

vs.

CENTRAL BANK OF CYPRUS, et. al.,

　　　　　　　　Defendants.

_____/

## REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (ECF NO. 104)

This matter is before the Court on a referral from the presiding District Judge. ECF No. 107.  Currently pending is Plaintiff's Motion for Entry of Default Judgment ("Motion") ECF No. 104.  Pursuant to Federal Rule of Civil Procedure 55(b)(2), I held a hearing on April 22, 2021, at which Plaintiff testified and submitted evidence for the Court's review. ECF No. 116. I have reviewed Plaintiff's Motion and the evidence before me. I am fully advised, and this matter is now ripe for decision. For the reasons stated below, the undersigned **RECOMMENDS** that the District Court **GRANT IN PART and DENY IN PART** Plaintiff's Motion (ECF No. 104) and enter a judgment in favor of Plaintiff for $5,111,577 in damages.

## BACKGROUND

Plaintiff Edward Fagan ("Plaintiff") brought the following causes of action against Defendants G.K. Finance Limited ("GK Finance"), APUS Finance Ltd. ("APUS Finance"), APUS Fund Management Ltd. ("APUS Fund"), G.E.O. Holdings Limited ("GEO"), Holdsworth Associates Venture Incorporated (Holdsworth), George Kallis a/k/a Georgios Kallis ("Mr. Kallis"; Fintop Ltd ("Fintop"), Brian Rance (Mr. Rance) (collectively "Defendants")  alleging (1) violation of Federal RICO law under 18 U.S.C. § 1962(c); (2) violation of conspiracy to violate Federal RICO Law under 18 U.S.C. 1962(c) and (d); (3) violation and conspiracy to violate Florida RICO Law under Florida Statute 895.01 et seq.; (4) fraud; (5) aiding and abetting; (6) breach of contract; (7) interference with contract; (8) fraudulent inducement; (9) rescission or specific performance; (10) civil theft; (11) unjust enrichment; (12) conversion; and (13) bailment. ECF No. 93. Defendants failed to appear, answer, or otherwise respond to Plaintiff's Amended Complaint. On February 9, 2021, Plaintiff filed a Motion for Clerks Entry of Default as to the Defendants. ECF No. 102. On February 9, 2021, the Clerk entered default against the Defendants. ECF No. 103. On February 18, 2021, Plaintiff filed his Motion for Entry of Default Judgment against Defendants Pursuant to Federal Rule of Civil Procedure 55(b)(1) ("Motion"). ECF No. 104. Plaintiff seeks a judgment in the amount of $13.68 million, trebled to $41.04 million pursuant to 18 U.S.C. § 1962(c), applicable interest, and compensation for expenses and court costs in the amount of $15,864.00. *See id*. at 2.

This case revolves around an Advanced Fee Fraud of which Plaintiff alleges he was a victim from 2012 to early January 2016. ECF No. 93 ¶¶ 1–2. Plaintiff's Amended Complaint describes a complicated web of companies starting with Holdsworth at the top of the food chain and the remaining companies wholly owned subsidiaries of each other. *Id*. ¶¶ 20–24. Holdsworth is located in the British Virgin Islands. *Id*. ¶ 24. George Kallis is an officer and director of G.K. Finance, APUS Finance, APUS Fund, GEO, and Holdsworth. *Id*. ¶ 25. Fintop is the designated agent for GK Finance, APUS Finance, APUS Fund, GEO, Holdsworth, and Mr. Kallis. *Id*. ¶ 27. Mr. Rance is the owner and an officer of Fintop, as well as a designated agent for GK Finance, APUS Finance, APUS Fund, GEO, Holdsworth, and Kallis. *Id*. ¶ 32. Mr. Kallis and his companies (GK Finance, APUS Finance, APUS Fund, GEO Holdings, and Holdsworth) used Mr. Rance and Fintop for all official representations on behalf of the companies. *Id*.

Plaintiff alleges in his Amended Complaint that from May 2013 to January 2016, Mr. Rance and Fintop, as the agents for Mr. Kallis and his companies, solicited Plaintiff and the others into entering into contract agreements in which they paid a fee in exchange for a line of credit. *Id*. ¶ 65. Mr. Owens, Mr. Stoeckl, Mr. Stuart, Mr. Kalchbrenner, Balruddery Investments, Mr. Melville, Mr. Drummond Hay, Mr. Kindersley, and Mr. Andriesz (collectively, the "Original Borrowers"), like Plaintiff, entered into contracts with the Defendants in which they paid a percentage of the contract's value in exchange for a line of credit. *See* ECF No. 112. Mr. Owens, Mr. Stoeckl, and Mr. Stuart state in their affidavits that they assigned 100% of their

"rights, including the right to make regulatory, criminal, and civil action complaints" to Mr. Fagan, as did the six other Original Borrowers. *Id*. at 3, 7, 19.  In total, Plaintiff states that he and the Original Borrowers paid $13.68 million in exchange for a line of credit valued at $1.368 billion. In other words, Plaintiff paid a non-refundable 1% advance fee of the face value of the contracts. ECF No. 93 ¶ 93. Plaintiff claims that instead of providing the line of credit, Defendants laundered the $1.368 billion and would not return the $13.68 million advance fees. *Id*. ¶ 89.

There are fourteen "advanced fee" contracts at issue here. They range in value from $10 million to $500 million. *Id*. ¶ 125. Most of them were originally executed in the early 2000s. *Id*. In 2012, Plaintiff and the Original Borrowers began to grow suspicious and asked Defendants to either honor the contracts or return the advance fee payment, plus interest. *Id*. ¶ 131. Between May and October 2013, "Defendants sent knowingly false statements intended to deceive and mislead Plaintiff from continuing efforts" to discover the owners of the $1.368 billion and the identity of the banks where the advance fees were deposited and held. *Id*. ¶ 133. These communications included "solicitations and inducements" to try to convince Plaintiff to enter into new contracts or reinstate the old ones. *Id*. ¶ 136. After much back-and-forth communication, Plaintiff agreed to reinstate the fourteen contracts in October 2013. *Id*. ¶¶ 142–45. Of the fourteen contracts, two were reinstated in October 2013 and the remaining were "committed to be reinstated" in December 2013. *Id*. ¶ 125. Between October 2013 and January 2016, Plaintiff alleges multiple "bad acts":

(1) Defendants never provided the required banking due diligence documents to prove the source of the 1.368 billion was "clean." *Id*. ¶¶ 114, 115, 128, 154.

(2) On October 28, 2013, Defendants told Plaintiff that since Plaintiff had performed on the reinstated contracts, Defendants would be transferring $100 million, however, they never did. *Id*. ¶¶ 15–53.

(3) Defendants referred to the contracts as either "money first" or "funds first" contracts. *Id*. ¶¶ 114, 164.

(4) Defendants withheld or concealed the identity of the trustee benefitting from the contracts and refused to disclose the source of the $1.368 billion they said they could provide. *Id*. ¶¶117, 159, 162.

(5) Defendants concealed the identity of the bank where the Advanced Fees were being held and lied about where the $1.368 billion was being held. *Id*. ¶¶ 145, 163.

(6) Defendants sent numerous misleading and false statements to Plaintiff via letter and email to induce Plaintiff into entering into new contracts and continue reinstating the old ones. *Id*. ¶¶ 135–36, 147–48.

(7) Defendants sent correspondence to Plaintiffs saying that they could not pay the $1.368 billion and provided false bank documents to try to demonstrate their inability to perform on the contracts. *Id*. ¶ 155.

(8) Defendants "conspired" to change the terms of the contracts, refused to transfer funds, and refused to communicate with Plaintiff's bank and financial advisors. *Id*. ¶¶ 158–60.

(9) Defendants—specifically Kallis and Rance—lied about deals they had made to show Plaintiff that they could make the $1.368 billion loan. *Id*. ¶ 161.

(10) Defendants induced Plaintiff to suspend efforts with the Cyprus police to bring criminal and civil charges by promising they would perform on the reinstated contracts. *Id*. ¶ 166.

(11) From September 2015 to January 2016, Defendants demanded that all of the contracts be wrapped into one contract "which would be performed and as such Defendants would be considered to have performed" on the original fourteen reinstated contracts. In exchange for performance, Plaintiff would give Defendants a document that the obligations were performed and completed. *Id*. ¶ 149.

## **DISCUSSION**

### I. **Default Judgment**

Rule 55 of the Federal Rules of Civil Procedure dictates that the clerk of court enter a party's default if the party "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Plaintiff filed the Amended Complaint (ECF No. 93) on June 25, 2020, and properly noticed Defendants (ECF Nos. 99, 100); Defendants never filed an answer or otherwise responded to the Amended Complaint. Consequently, the clerk of court entered a default against Defendants on February 9, 2021. ECF No. 103. Plaintiff then filed the instant Motion for Entry of Default Judgment on February 18, 2021 (ECF No. 104). He also filed an Affidavit in Support of the Motion for Entry of Default Judgment (ECF No. 105) ("First Declaration"), Notice of Joint Liability (ECF No. 106), a Supplemental Declaration from Mr. Fagan ("Second Declaration") with

supporting exhibits (ECF Nos. 111, 111-1), Affidavits from Mr. Stoeckl, Mr. Stuart, and Mr. Owens (ECF No. 112), and a third Declaration from Mr. Fagan ("Third Declaration") with additional supporting evidence (ECF Nos. 114 and 117).[1]

After entry of the clerk's default, the court may enter default judgment against the defendant so long as the defendant is not an infant or incompetent person. Fed. R. Civ. P. 55(b)(2). When default judgment is entered, "the defendant 'admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by entry by the judgment, and is barred from contesting on appeal the facts thus established.'" *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (quoting *Nishimatsu Construction Co., Ltd. V. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). A court must review the sufficiency of the complaint before determining whether a moving party is entitled to default judgment pursuant to Rule 55(b). *See United States v. Kahn*, 164 F. App'x 855, 858 (11th Cir. 2006) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). "'While a complaint . . . does not need detailed factual allegations,' a plaintiff's obligation to provide the grounds of his entitlement to relief 'requires more than labels and conclusion, and formulaic recitation of the elements of the cause of action will not do.'" *Fernandez de Cordob v. Flores*, No. 17-20122-cv-Williams, 2018 WL 1830805, at *2 (S. D. Fla. Jan. 10, 2018) (J. Torres) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), *report and recommendation adopted*, 2018 WL 1811945 (S.D. Fla. Feb. 9, 2018) (J. Williams).

---

[1] Plaintiff also submitted Notice of New Evidence on May 13, 2021. ECF No. 118.

If the admitted facts are sufficient to establish liability, the Court must then turn to the question of relief. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1364 n.27 (11th Cir. 1997). After ascertaining the appropriate amount of damages, the Court must enter final judgment in that amount. *Nishimatsu*, 515 F.2d at 1206; *see also PetMed Express, Inc. v. MedPets.com, Inc.*, 336 F. Supp. 2d 1213, 1216 (S.D. Fla. 2004).

1. **Liability**

a. *Count I: Federal RICO Violation, 18 U.S.C. § 1962(c)*

Section 1962(c) of the RICO Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Civil RICO claims are "essentially a certain breed of fraud claims," and must therefore be pled with the increased level of specificity required by Rule 9 of the Federal Rules of Civil Procedure. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007); *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997). To establish a civil RICO violation under § 1962(c), a plaintiff must satisfy the following elements of proof: (1) the existence of an enterprise, (2) that the enterprise affected interstate commerce, (3) that the defendants were employed by or associated with the enterprise, (4) that the defendants participated in the conduct of the affairs of the enterprise, (5) that the affairs of the enterprise were conducted through a pattern of racketeering activity, (6) that the plaintiff suffered damages, and (7) that the

defendant was both the but-for and proximate cause of the damages. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Ray v. Spirit Airlines*, 836 F.3d 1340, 1348 (11th Cir. 2016).

I find that Plaintiff has adequately pled the existence of the enterprise, the association between the Defendants and the enterprise, and the Defendants' participation in the conduct of the enterprise. An enterprise must have (1) common purpose that is criminal in nature, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit the enterprise associates to pursue the common purpose. *Almana v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017). Such an enterprise has been adequately pled here. The Amended Complaint describes the enterprise as a group of "persons/entities/financial institutions" domiciled in the British Virgin Islands that "associated together in fact for the common purpose of carrying out an ongoing criminal enterprise." ECF No. 93 ¶¶ 174–75. The Amended Complaint describes the common purpose was two-fold: (1) to launder the $1.368 billion that was supposed to be lent to Plaintiff as a line of credit, and (2) to allow Defendants to "retain, withhold, convert, steal and refuse to account for the $13,68 million" Plaintiff paid to Defendant in exchange for the line of credit. *Id.* ¶¶ 106–07. The described scheme began in 2013 and is still ongoing. *Id.* ¶ 181. The Amended Complaint describes the associations between the Defendants as follows: APUS Fund is a wholly owned subsidiary of APUS Finance. *Id.* ¶ 22. APUS Finance is a wholly owned subsidiary of GK Finance. *Id.* ¶ 21. GK Finance is a wholly owned subsidiary of GEO Holdings. *Id.* ¶ 20. GEO Holdings is a wholly owned

subsidiary of Holdsworth. *Id*. Mr. Kallis is an officer and director of Holdsworth, GEO Holdings, GK Finance, APUS Finance, and APUS Fund. *Id*. ¶ 25. Fintop is the designated agent for Holdsworth, GEO Holdings, GK Finance, APUS Finance, APUS Fund, and Mr. Kallis. *Id*. ¶ 26. Fintop is owned by Mr. Rance. *Id*. ¶ 27. The Amended Complaint clearly states numerous times that Mr. Kallis and Mr. Fintop worked on behalf of their respective companies to induce Plaintiff to enter into the fourteen advanced fee contracts. Those advanced fee contracts were the vehicle for the fraudulent scheme.

The Amended Complaint also adequately establishes that the funds sent to Defendants interacted with and affected interstate and foreign commerce. The Amended Complaint plainly states, "At all relevant times, the Criminal Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of § 1962(c)." *Id*. ¶ 201. More specifically, Plaintiff alleges Defendants used foreign banks and financial institutions that maintained US dollar accounts to clear financial instruments and transfer moneys in furtherance of the enterprise. *Id*. ¶ 97. Plaintiff also submitted as evidence with his Motion for Default Judgment banking records showing movement of some of the described monies pursuant to the contracts between various bank accounts in the United States and abroad.

The next inquiry then is a determination of whether the Amended Complaint sets forth facts sufficient to establish that Defendants engaged in a "pattern of racketeering activity." To successfully allege a pattern of racketeering activity, a plaintiff must allege that (1) the defendants committed two or more predicate acts

within a ten-year time span; (2) the predicate acts are related to one another; and (3) the predicate acts demonstrate a continuing nature of criminal conduct. *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239–43 (1989); *Jackson v. Bellsouth Tel., Inc.*, 372 F.3d 1250, 1265 (11th Cir. 2004). The predicate acts are identified in 18 U.S.C. § 1961(1). The downfall of the Plaintiff's civil RICO allegation lies with the third prong.

The RICO statute targets "ongoing criminal activity, rather than sporadic, isolated criminal acts." *Jackson*, 372 F.3d at 1264 (emphasis original). "The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address – one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future." *Id.* at 1265. Continuity can be established in one of two ways. *H.J. Inc.*, 492 U.S. at 241–42. The first way, "closed-ended continuity," consists of repeated predicate acts over a closed but substantial period of time that demonstrates a defendant's long-term criminal activity. *Id*. The second way, "open-ended continuity," requires the Plaintiff to show either (a) that there is a specific threat of repetition of the racketeering acts extending indefinitely into the future or (b) that the racketeering acts are part of defendant's regular way of doing business. *Id*. The duration of the pattern of racketeering activity must be measured by the RICO predicate acts, regardless of when the plaintiff alleges the overall scheme began. *See DeFalco v. Bernas*, 244 F.3d 286, 322 n. 22 (2d Cir. 2001) ("[T]o determine whether the plaintiffs satisfied the requisite period of closed-

ended continuity for the Bernas defendants, the duration of the pattern of racketeering activity must be measured by the RICO predicate acts that the jury found the Bernas defendants committed.").

The Amended Complaint makes one reference to the continuity requirement: "The Criminal Enterprise . . . consisted of an open-ended continuity that has repeated and portions of which continue to present." ECF No. 93 ¶ 215. This standalone, conclusory statement does not allege that there is a specific threat of the three predicate acts (mail fraud governed by 18 U.S.C. §1341, wire fraud governed by 18 U.S.C. § 1343, and money laundering governed by 18 U.S.C. § 1956(a)(1)) continuing into the future, nor does it allege that the predicate acts are a part of Defendants' regular way of doing business. Based on the facts alleged in the Amended Complaint, the mail and wire fraud lasted until September 2015 and the money laundering seems to have ended in January 2016. It is not clear to this Court, based on the facts pled, that there is any specific threat of the racketeering activity continuing into the future, nor did Plaintiff plead that this was part of the Defendants' regular way of doing business. We must reject Plaintiffs' general, conclusory allegations that the scheme "has repeated and portions . . . continue to present." ECF No. 93 ¶ 215; *see also American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293–94 (11th Cir. 2010) (rejecting conclusory statements, without any factual backing, made in connection with a RICO conspiracy claim); *Cordoba v. Flores*, No. 17-20122, 2018 WL 1830805, at *5 (S.D. Fla Jan. 10, 2018) (J. Torres) (finding

complaint insufficient to plead open-ended continuity where the complaint merely stated that the scheme "continues through the filing of this Complaint").

The Amended Complaint, without more, also cannot support any claim that Defendants regularly engage in this type of fraudulent scheme in the course of conducting their business. *See Vivridis Corp. v. TCA Global Credit Master Fund, L.P.*, 155 F. Supp. 1344, 1364 (S.D. Fla. 2015) (complaint that merely contained statement that every company involved with defendant was subject to alleged predatory lending scheme insufficient for closed-end continuity due to the conclusory nature of the allegations). Thus, I do not find that Plaintiff has adequately pled the continuity prong required to establish a pattern of racketeering activity. As such, the Amended Complaint has not adequately pled a cause of action for civil RICO and Plaintiff's Motion for Default Judgment should be **DENIED** as to Count I.

b. *Count II: Violation of conspiracy to violate Federal RICO Law under 18 U.S.C. 1962(c) and (d)*

Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including Section 1962(c). *American Dental*, 605 F.3d at 1293. An agreement to participate in a RICO conspiracy can be proved in one of two ways: (1) by showing an "agreement on an overall objective," or (2) in the absence of such an agreement, by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in the "single objective" conspiracy. *United States v. Church*, 955 F.2d 688, 694 (11th Cir. 1992). However, "a conspiracy itself furnishes no cause of action." *Spain v. Brown &*

*Williamson Tobacco Corp.*, 230 F.3d 1300, 1311 (11th Cir. 2000). "The gist of the action is not the conspiracy but the underlying wrong that was allegedly committed. If the underlying cause of action is not viable, the conspiracy claim must also fail." *Id.*; *see also Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007) ("Thus, where a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails.").

As discussed, the underlying substantive civil RICO claim is not viable because the Amended Complaint does not adequately allege facts that would allow me to find that Defendants engaged in a "pattern of racketeering activity." Plaintiffs are therefore not entitled to default judgment on Count II. *See Emess Capital, LLC v. Rothstein*, 2011 WL 13214302, at *10–11 (S.D. Fla. Mar. 9, 2011) (granting motion to dismiss as to RICO conspiracy claims when allegations supporting Section 1962(c) claim failed to establish actual RICO violation). Plaintiff's Motion for Default Judgement should be **DENIED** as to Count II.

c.  *Count III: Violation and conspiracy to violate Florida RICO law under Florida Statute 895.01 et seq.*

Count Three alleges a violation of Florida Statutes § 895.01 et seq. Fla. Stat. § 895.03(3) provides in pertinent part:

> It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.

As the Eleventh Circuit has explained, "[b]ecause 'Florida courts often look to the Federal RICO decisions for guidance in interpreting and applying the act[,]' the

analysis we apply to . . . federal RICO claims is equally applicable to . . . state RICO claims." *Jackson*, 372 F.3d at 1263–64 (quoting *Fla. Software Sys., Inc. v. Columbia/HCA Healthcare Corp.*, 46 F. Supp. 2d 1276, 1284 (M.D. Fla. 1999)). *See also All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir. 1998) ("Florida's RICO statutes have consistently been interpreted using federal RICO claim cases."). Thus, for the reasons stated for Count I, I find that Plaintiff's Motion for Default Judgment should be **DENIED** as to Count III.

    *d. Count IV: Common Law Fraud*

    Count Four alleges common law fraud against all Defendants in that they knowingly made specific misrepresentations to Plaintiff to induce him to "(i) change his position on October 2, 2013; (ii) to enter into the reinstatement and commitment to reinstate the [f]raudulent [c]ontracts and (iii) to stop his efforts to collect and secure the return of the 13.68 million US Dollars" in advanced fees. ECF No. 93 ¶ 263. The Amended Complaint states that Plaintiff relied on these misrepresentations in deciding to change his position, reinstate the contracts, and halt his efforts to collect the $13.68 million. *Id*. ¶ 265. As a result of his reliance, Plaintiff alleges that he suffered damages. *Id*. ¶ 266.

    The elements of Florida common law fraud are that: (1) the defendant made a false statement or omission of material fact; (2) the defendant knew the statement was false; (3) the statement was made for the purpose of inducing plaintiff to rely on it; (4) plaintiff's reliance was reasonable; and (5) plaintiff suffered damages. *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, No. 16-80056-CIV-WPD, 2016

WL 9413421, at *3 (S.D. Fla. June 29, 2016) (J. Dimitrouleas); *see also Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985). Common law fraud is subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. *Broadway Gate Master Fund*, 2016 WL 9413421, at *3. Under Rule 9(b), a fraud plaintiff must allege (a) the precise statements, documents, or misrepresentations made; (b) the time, place, and person responsible for the statement; (c) the content and manner in which these statements misled the plaintiffs; and (d) what the defendants gained by the alleged fraud. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997).

The Amended Complaint properly alleges facts to support the claim for common law fraud. The Amended Complaint alleges the specific misrepresentations Defendants made, alleges that Defendants made the statements to induce Plaintiff to enter into or reinstate the contracts, and that Plaintiff suffered damages as a result of the fraud. Although Plaintiff does not state specifically that Defendants had actual knowledge of their misrepresentations or that Plaintiff's reliance on the misrepresentations was reasonable, viewing the facts alleged in the light most favorable to Plaintiff, I find the pled facts to adequately support both inferences.

The Amended Complaint also satisfies the specificity requirements of Rule 9(b). The Amended Complaint alleges that the misrepresentations Defendants made to Plaintiff and his financial representatives include but are not limited to:

> "(i) [t]he [f]fraudulent [c]ontract were void from the outset; (ii) Defendants never intended to perform their obligations under [t]he [f]raudulent [c]ontract; (iii) Defendants were not the true owners, nor did they have absolute authority over the 1.368 billion US

Dollars . . . ; (iv) [t]he [f]raudulent [c]ontracts were used to launder 1.368 billion US Dollars . . . ; (v) Defendants were not entitled to receive and retain the 13.68 million US Dollars that were paid subject to Defendants performance; and (vi) when Defendants would perform their obligations under [t]he [f]raudulent [c]ontracts."

ECF No. 93 ¶ 261. Plaintiff goes on to state that these misrepresentations were made in letters and emails. *Id.* ¶ 262. The Amended Complaint lists each relevant communication, the date it was sent, the sender and receiver, and the type of communication (e-mail or letter). ECF No. 93 ¶¶ 136(i)–(xxiv), 148 (i)–(xlvi). Although not every communication listed includes description of its contents, many of them do include a detailed description that I find to be sufficient to satisfy the specificity requirements of Rule 9(b). Thus, I find that Plaintiff's Motion for Default Judgment should be **GRANTED** as to Count IV.

### e. *Count V: Aiding and Abetting*

Count Five alleges a cause of action for aiding and abetting against all Defendants. The Amended Complaint alleges (1) that each Defendant assisted with the criminal enterprise scheme and conspired to commit racketeering activities; (2) that the Defendants' aiding and abetting was necessary to achieve the individual bad acts of the criminal enterprise scheme; and (3) as a result of Defendants' aiding and abetting, Plaintiff suffered damages. ECF No. 93 ¶¶ 268–71.

Florida courts have recognized aiding and abetting the commission of a tort as a standalone claim. *See Gilison v. Flagler Bank*, 303 So. 3d 999, 1002 (Fla. 4th DCA 2020) (aiding and abetting fraud); *MP, LLC v. Sterling Holding, LLC*, 231 So. 3d 517, 527 (Fla. 3d DCA 2017) (aiding and abetting breach of fiduciary duty). The following

elements must be alleged "to state a claim for aiding and abetting a common law tort" under Florida law: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter [sic]; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Angell v. Allergan Sales, LLC*, No. 3:18-cv-282-J-34JBT, 2019 WL 3958262, at *8 (M.D. Fla. Aug. 22, 2019); *see also Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (applying the above elements to three Florida tort claims). These cases demonstrate Florida recognizes a common-law claim of aiding and abetting tortious conduct. Thus, for purposes of resolving the instant motion, the Court assumes, without deciding, that aiding and abetting can be a valid cause of action under Florida law.

I do not find that Plaintiff has adequately pled a cause of action for aiding and abetting in this case. First, it is not entirely clear what underlying "violation" Plaintiff alleges Defendants were aiding and abetting. For that reason alone, a claim that lacks sufficient facts to establish what Defendants aided and abetted should be denied.

Based on the facts alleged in this section of the Amended Complaint, there is some indication that Plaintiff is alleging that Defendants were aiding and abetting in the violations of civil RICO by assisting the criminal enterprise with its "pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). Under that theory, the claim still fails. Applying the Supreme Court's reasoning in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), I do not

find that the civil RICO statute provides for aiding and abetting liability.[2] Other Courts have found the same. *See, e.g., Jubelirer v. MasterCard Int'l*, 68 F. Supp. 2d 1049, 1054 (W.D. Wis. 1999); *Touhy v. N. Trust Bank*, No. 98 C 6302, 1999 WL 342700, at *3–4 (N.D. Ill. May 17,1999) ("Thus, even though this court must construe RICO liberally . . . this court cannot ignore the clear indication by Congress in failing to reference 18 U.S.C. § 2 in the language of § 1962(c) as well."); *Sorrano v. New York Life Ins. Co.*, No. 96 C 7882, 1999 WL 104403, *7–8 (N.D. Ill. Feb. 24, 1999); *Penn. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 843–44 (3d Cir. 2000); *Ling v. Deutsche Bank*, No. 04 CV 4566 (HB), 2005 WL 1244689 (S.D.N.Y. May 26, 2005); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 256 (S.D.N.Y. 1997) ("Following the reasoning in *Central Bank*, this Court declines to create a private right of action for aiding and abetting a RICO violation. Nowhere in the text of Section 1962 is there any indication that Congress intended to impose aiding and abetting liability for a violation of the RICO statute."); *Wuliger v. Liberty Bank, N.A.*, No. 3:02 CV 1378, 2004 WL 3377416 (N.D. Ohio Mar. 4, 2004); *In re MasterCard Int'l, Inc.*, 132 F. Supp. 2d 468, 494–95 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002). Thus, I do not find that Plaintiff has pled a proper cause of action and thus is not entitled to a default judgment for aiding and abetting. I find that Plaintiff's Motion for Default Judgment should be **DENIED** as to Count V.

f. *Count VI: Breach of Contract*

---

[2] In *Central Bank*, the Supreme Court held that there is no cause of action for aiding and abetting violations of the Securities Exchange Act. 511 U.S. at 191.

Plaintiff alleges Defendants breached the fourteen contracts by (1) failing to retain Plaintiff's $13.68 million; (2) failing to confirm the existence of the bank where the $13.68 million would be transferred and held; (3) failing to repay the $13.68 million at the end of the contract term; (4) failing to provide guarantees such as a letter of credit, bank guarantee, or other acceptable  security; (5) failing to provide the required banking due diligence documents to prove the source of the 1.368 billion was "clean"; (6) failing to comply with their obligations to provide customary and required due diligence documentation under the Wolfsberg Anti-Money Laundering Principles; (7) failing to provide due diligence paperwork authorizing the transfer of funds or congemination of availability of the funds in the form Plaintiff's bank required. ECF No. 93 ¶¶ 273–76. Plaintiff alleges that as a direct and proximate result of Defendants' breach of the contracts, Plaintiff was unable to enter into infrastructure development projects and trading programs and thus suffered damages and lost business opportunities. *Id*. ¶¶ 278–79.

Under Florida law, to state a cause of action for breach of contract, the movant must demonstrate the existence of a contract which it has a right to enforce, breach of that contract, and damages flowing from such breach. *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000); *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So. 2d 564, 564 (Fla. 4th DCA 1992). Here, Plaintiff does not allege that he was an original party to any of the contracts described in the Amended Complaint. Of the fourteen contracts at issue in this case, Plaintiff offered five as evidence in support of his Motion for Default Judgement.

ECF No. 111-1. Plaintiff was not personally a party to any of those contracts. Although Plaintiff himself was not a party to all of the contracts at issue, he argues that he has standing to enforce them through assignment.

A party may obtain the right to enforce a contract through assignment. An assignment has been defined as "a transfer or setting over of property, or of some right or interest therein, from one person to another." *Cont'l Cas. Co. v. Ryan Inc. E.*, 974 So. 2d 368, 376 (Fla. 2008) (internal quotation omitted). Assignment, essentially, is the "voluntary act of [t]ransferring an interest." *DeCespedes v. Prudence Mut. Cas. Co.*, 193 So. 2d 224, 227 (Fla. 3d DCA 1966). Once transferred, the assignor no longer has a right to enforce the interest because the assignee has obtained all "rights to the thing assigned." *Price v. RLI Ins. Co.*, 914 So. 2d 1010, 1013–14 (Fla. 5th DCA 2005) (quoting *Lauren Kyle Holdings, Inc. v. Heath–Peterson Constr. Corp.*, 864 So. 2d 55, 58 (Fla. 5th DCA 2003)); *Estate of Basile v. Famest, Inc.*, 718 So.2d 892 (Fla. 4th DCA 1998). Regarding contract assignment, Florida Law states in relevant part:

> (2) Except as otherwise provided in s. 679.4061, unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on her or him by her or his contract, or impair materially her or his chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of her or his entire obligation can be assigned despite agreement otherwise. . . . (5) An assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of rights and unless the language or the circumstances (as in an assignment for security) indicate the contrary, it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by her or him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract.

Fla. Stat. §672.210 (2),(5). Furthermore, Florida courts have held that "assignability of a cause of action is the rule rather than the exception." *See Selfridge v. Allstate Ins.*, 219 So.2d 127, 128 (Fla. 1969). A party may assign almost any cause action, with the noted exception of claims for personal injury.[3] *Florida Power Corp. v. McNeely*, 125 So.2d 311 (Fla.1960); *State Road Dept. v. Bender*, 147 Fla. 15, 2 So.2d 298 (1941); *Notarian v. Plantation AMC Jeep*, 567 So.2d 1034 (Fla. 4th DCA 1990).

The Amended Complaint states that Plaintiff "acquired and is the owner of 100% of the rights" to all of the contracts. ECF No. 93 ¶ 17. Plaintiff submitted affidavits from Mr. Owens, Mr. Stoeckl, and Mr. Stuart. *See generally* ECF No. 112. Mr. Stoeckl states in his affidavit that he assigned his rights to Plaintiff, and the assignment "was the result of Mr. Fagan paying money, providing other things of value and his willingness/desire to go into business with my partners and me and the others." *Id.* at 3, n.1. He also states that in 2014, he, Dr. Bojan Kalchbrenner,

---

[3] Florida courts have generally held that a contract provision prohibiting assignment is generally enforceable. *See Troup v. Meyer*, 116 So.2d 467 (Fla. 3d DCA 1959). Although the record contains only a small sampling of the contracts, there does not appear to be a provision expressly prohibiting assignment. Thus, I decline to assume that any of the contracts contained such a provision that would inhibit the assignor's rights to make valid assignments. Furthermore, Courts have distinguished between contract provisions which prohibit assignment of the party's "rights" under a contract, but do not expressly preclude a party's right to assign a claim for damages arising from a contract breach. *Rosecrans v. William S. Lozier, Inc.*, 142 F.2d 118, 124 (8th Cir. 1944) ("The prohibition of the contract against assignment is against an assignment of the rights and privileges under the contract. This prohibition of assignment does not, however, prohibit the assignment of a claim for damages on account of breach of the contract."); *Charles L. Bowman & Co. v. Erwin*, 468 F.2d 1293, 1297 (5th Cir. 1972) ("The law draws a distinction . . . between assignment of performance due under a contract and assignment of the right to receive contractual payments."); *Cordis Corp. v. Sonic Intern., Inc.*, 427 So.2d 782, 783 (Fla. 3d DCA 1983).

Balruddery Investments, Eddie Owns, and Mr. Alastair Melville, all "assign[ed] 100% of our rights, including the rights to make regulatory, criminal and civil action complaints to Mr. Fagan. Those assignments remain valid and continue to the present." *Id*. at 7. With regard to the assignment of contract rights, Mr. Stuart's affidavit states that Mr. Fagan is the "owner and successor to the rights to recover $13.68 million in advance fees" and that he, Mr. Stoeckl, Mr. Kalchbrenner, Balruddery investments, Eddie Owns, and Mr. Melville have all assigned their rights to Mr. Fagan as well. *Id*. at 10–11 ("I / we assigned the rights to our contract and to the recovery of the 1% Advance fee and other damages over to Mr. Fagan. That assignment remain[s] valid and continue[s] to the present."). Finally, Mr. Owens states in his affidavit that in 2014, Dr. Kalchbrenner, Mr. Stoeckl, Mr. Drummond Hay, Mr. Kindersley, Mr. Andriesz, Mr. Stuart, and Mr. Melville, and himself all "assigned 100% of our rights, including the rights to make regulatory, criminal and civil action complaints to Mr. Fagan. Those assignments remain valid and continue to the present." *Id*. at 19. Thus, although Plaintiff states that he is the owner of the rights under all of the contracts, the record before me reflects that he was only assigned rights under some, not all, of the contracts at issue. Thus, I find that based on the representations made in the affidavits by persons with personal knowledge, only the assignment of rights under contracts between Defendants and the nine individuals/companies specifically stated in the affidavits, are valid.[4] Based on the

[4] To reiterate, those nine individuals/companies are Mr. Stoeckl, Mr. Stuart, Mr. Owens, Mr. Kalchbrenner, Balruddery Investments, Mr. Melville, Mr. Drummond Hay, Mr. Kindersley, Mr. Andriesz. There is also evidence in the record that Mr.

Amended Complaint and evidence presented, it appears that all of the contracts listed in the Amended Complaint except the "FRISANT" contract were between Defendants and one of the nine Original Borrowers.[5] Additionally, Plaintiff submitted another contract (the "LISETONIA" contract), the parties to which were Defendants and Mr. Kalchbrenner. Thus, I find that there is sufficient evidence to support a finding that the rights associated with thirteen contracts were validly assigned to Plaintiff. Therefore, as the assignee, Plaintiff steps into the shoes of the assignors and obtains all rights under the contracts, including the right to bring a cause of action for breach of contracts to which he was not originally a party. *Price v. RLI Ins. Co.*, 914 So. 2d 1010, 1013–14 (Fla. 5th DCA 2005).

"To state a valid cause of action for breach of contract, a plaintiff must establish three elements: (1) a valid contract; (2) a material breach; and (3) damages*." Collins v. Certain Underwriters at Lloyd's, London Subscribing to Policy No. B0723AI00342A10*, 2012 WL 13014690, at *2 (S.D. Fla. Apr. 24, 2012) (J. Turnoff) (internal quotation omitted). "A 'material breach' of a contract is a failure, without legal excuse, to perform any promise or obligation or that goes 'to the essence of the

---

Melville is the "director and signatory" for APT Group, who was a party to seven contracts with Defendants. ECF Nos. 117 at 127–28; 111-1 at 99.

[5] The MIRIEN contract was between Defendants and Frederick Specht and Stephan Frischknecht on behalf of Moosberg Beratungen und Immobilien AG, who were not expressly listed as a party that assigned its contract rights to Plaintiff. *See* ECF No. 111-1 at 91. However, Mr. Stuart's declaration states that he and his partners were parties to the contract under the name Mooseberg Beratungen. ECF No. 112 at 10. Neither the Amended Complaint nor the supplemental evidence in support of the Motion for Default Judgment identify the parties to the FRISANT contract, thus I decline to find that it was validly assigned to Plaintiff.

contract.'" *Oriole Gardens Condos., III v. Indep. Cas. & Sur. Co.*, 2012 WL 718803, at

*11 (S.D. Fla. Mar. 6, 2012) (J. Huck) (quoting *Covelli Family, LP v. ABG5, LLC*, 977

So. 2d 749, 752 (Fla. 4th DCA 2008); *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So.

2d 853, 857 (Fla. 4th DCA 1972)). "An injured party in a breach of contract is entitled

to recover those damages that 'naturally flow from the breach and can reasonably be

said to have been contemplated by the parties at the time the contract was entered.'"

*Saade v. Insel Air*, No. 17-22003-Civ, 2020 WL 3316047, at *3 (S.D. Fla. May 15, 2020)

(J. Torres) (quoting *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280

(Fla. 5th DCA 2002)).

 Plaintiff has met each element of his breach of contract claim because he

alleges that Plaintiff (and the Original Borrowers whose contract rights were

assigned to him) entered into the contracts with Defendants in the early 2000s and

reinstated them or committed to reinstating them in October or December 2013. ECF

No. 93 ¶ 125. Plaintiff also submitted as evidence with its Motion for Default

Judgment six of the fourteen contracts at issue. ECF No. 111-1. Plaintiff alleges that

Defendants breached the contract for the reasons previously stated and that as a

result of these breaches, he suffered damages in the amount of $13.68 million (the

amount Plaintiff paid to uphold is end of the bargain). Because Plaintiff has alleged

each element of a breach of contract claim and the complaint includes well-pleaded

factual allegations, Plaintiff's Motion for Default Judgment should be **GRANTED** as

to Count VI, but only with regard to those contracts where there is sufficient evidence

of a valid assignment to Plaintiff. As previously explained, those thirteen contracts

("Assigned Contracts") are as follows: MIOKATE, ZORMAK, MESABEC, NIOMISA, GLASCOW, MOSAIC, APT/TTT/GKF/400, LEOMARIS, B68733601H, UO3586316729, FIN/100EM/APT2/170610, MIRIEN, and LISETONIA.

g. *Count VII: Contract Interference*

Plaintiff alleges that the "Doe Defendants" interfered with Plaintiff's ability to secure the funds from the contracts and with Defendants' ability to perform their obligations under the contracts. ECF No. 93 ¶¶ 282–85. Plaintiff alleges that as a direct and proximate result of Doe Defendants interference, Plaintiff "suffered damages and lost business opportunities." *Id*. ¶ 287. As a threshold matter, a default judgment against the "Doe Defendants" is improper. The clerk of court may only enter a party's default if, after being served the complaint, the party fails to plead or otherwise defend. Fed. R. Civ. P. 55(a). The identities of the "Doe Defendants" are unknown to Plaintiff. *See* ECF No. 93 ¶¶ 40–41. Plaintiff could not, of course, serve his Amended Complaint on unknown individuals. As such, the clerk of court only entered default against the named Defendants for whom Plaintiff could show proof of service of the Amended Complaint. That did not include the Doe Defendants. *See* ECF No. 103 (listing Defendants as the only defendants against whom default was entered). Accordingly, Plaintiff's Motion for Default Judgement as to Count VII should be **DENIED** as it pertains only to Defendants against whom the Amended Complaint was not served and default was not entered by the clerk of courts.

h. *Count VIII: Fraudulent Inducement*

Fraudulent inducement is based in contract law and is the inducement to enter into a contract. The essential elements of fraudulent inducement are (1) false statement of material fact; (2) the maker of the statement knew or should have known of the statement's falsity; (3) the maker intended to induce the claimant's reliance on the statement; (4) the claimant relied on the statement to its detriment. *Rose v. ADT Sec. Services, Inc.*, 989 So. 2d 1244, 1247 (Fla. 1st DCA 2008); *see also White Const. Co. v. Martin Marietta Materials, Inc.*, 633 F. Supp. 2d 1302, 1325–26 (M.D. Fla. 2009). Typically, a claim must be based on a false statement about a past or existing fact, rather than an unfulfilled promise of future action. *See, e.g., Mejia v. Jurich,* 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001). However, a promise of future action made with no intention to perform or with positive intention not to perform may constitute fraudulent misrepresentation. *Id*. A claim for fraudulent inducement also must be sufficiently specific to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b).

Plaintiff's fraudulent inducement claim is based on the same statements that served as the basis for his fraud claim. ECF No. 93 ¶ 290. Plaintiff alleges that the misrepresentations made (mostly by Mr. Rance) between October 2013 and January 2016, were intended to induce Plaintiff to change his position in October 2013 and reinstate the contracts instead of continuing in his efforts to secure the return of the $13.69 million paid for the contracts. *Id*. ¶ 291. Plaintiff alleges that he relied on those misrepresentations and was, in fact, induced into reinstating the contracts, and that as a result of his reliance on the misrepresentation, he suffered damages. *Id*. ¶¶ 293–

94. For the same reasons stated for Plaintiff's fraud claim (Count IV), I find that Plaintiff has adequately pled a claim for fraudulent inducement. However, because fraudulent inducement is a claim based in contract rights, Plaintiff can only state a valid fraudulent inducement claim for those contracts where there is sufficient evidence of a valid assignment to Plaintiff. Therefore, Plaintiff's Motion for Default Judgment should be **GRANTED** as to Count VIII, but only as to the Assigned Contracts.

       i. *Count IX: Rescission or Specific Performance*

Rescission is an equitable remedy, not a cause of action, whose object is "to undo the original transaction and restore the former status of the parties." *Billion v. Mobil Corp.*, 710 So. 2d 984, 991 (Fla. 4th DCA 1998) (quoting *Willis v. Fowler*, 102 Fla. 35, 136 So. 358, 367–69 (1931)). Under Florida law, the following fundamental requirements must be met for a court to award the remedy of rescission:

> (1) the character or relationship of the parties; (2) the making of a contract; (3) the existence of fraud, mutual mistake, false representation, impossibility of performance, or other ground for rescission or cancellation; (4) the party seeking rescission had rescinded the contract and notified the other party to the contract of such rescission; (5) [if] the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) the moving party has no adequate remedy at law.

*Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1206 (M.D. Fla. Apr. 15, 2002) (citing *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. 2d DCA 1965)). "The rule is well settled in this country that cancellation or rescission will not be granted solely for breach of contract, in the absence of fraud,

mistake, undue influence, multiplicity of suits, cloud on title, trust, or some other independent ground for equitable interference." *Int'l Realty Assocs. v. McAdoo*, 87 Fla. 1, 99 So. 117, 119 (1924).

First, applying the aforementioned standard, Plaintiff has adequately pled elements one and two as to the Assigned Contracts by alleging the relationship between Plaintiff, the assignors of the contracts, Defendants, and the existence of the contracts between them. Plaintiff has adequately pled the existence of false representations based on their allegations that the Defendants made false promises regarding the contracts and the money that would be available to Plaintiff, but ultimately never was. Where the Amended Complaint falls short, however, is with regard to the notice provision. The Amended Complaint does not contain facts adequate to establish that Plaintiff notified Defendants of the rescission of the contract. Before rescinding the contract, the purchaser must provide proper notice to the seller as to his intentions. *See Frank Griffin Volkswagen, Inc. v. Smith*, 610 So. 2d 597, 605 (Fla. 1st DCA 1992) (providing that written notice and oral notice are proper forms of notice to satisfy the notice requirement). *See, e.g., Beaver v. Inkmart*, No. 12–60028, 2012 WL 3822264, at *6 (S.D. Fla. Sept. 4, 2012) (J. Middlebrooks) (finding the following statement sufficient to establish the notice requirement for purposes of surviving a motion to dismiss: "On December 9, 2011, Beaver, acting through his attorney, notified Defendant INKMART of his recission of the Master Franchise Agreement and all other companion agreements, and demanded that INKMART acknowledge his rescission within 10 days of receipt of that notice.").

Like rescission, specific performance is a remedy, not a cause of action. *Castigliano v. O'Connor*, 911 So. 2d 145, 148 (Fla. 3d DCA 2005). A decree of specific performance is an equitable remedy "not granted as a matter of right or grace but as a matter of sound judicial discretion" governed by legal and equitable principles. *Humphrys v. Jarrell*, 104 So. 2d 404, 410 (Fla. 2d DCA 1958). Specific performance shall only be granted when (1) the plaintiff is clearly entitled to it, (2) there is no adequate remedy at law, and (3) the judge believes that justice requires it. *Mrahunec v. Fausti*, 385 Pa. 64, 121 A.2d 878, 880 (1956). Plaintiff seeks an order from the Court directing Defendants to perform their obligations under the contracts by making the $1.368 billion available to Plaintiff within a reasonable fixed period of time. ECF No. 93 ¶ 300(i). I do not find it reasonable to grant Plaintiff's request for the relief of specific performance for two reasons. For one, there is an adequate remedy at law in that monetary damages will afford complete legal relief to Plaintiff. Additionally, it has been almost twenty years since the original advanced fee contracts were signed. It is quite clear that Defendants will not uphold their end of the contracts, regardless of whether the Court orders them to or not. They have had twenty years and multiple contract reinstatements to do so and they have not. Thus, I believe a far more just remedy for Plaintiff is monetary damages, and not specific performance. For the foregoing reasons, Plaintiff's Motion for Default Judgment should be **DENIED** as to Count IX.

*j.   Counts X and XII: Civil Theft and Conversion*

To establish a claim of civil theft, a plaintiff must demonstrate, by clear and convincing evidence, that the defendant knowingly obtained or used a plaintiff's property with the intent to, either temporarily or permanently deprive the plaintiff of a right to the property or a benefit therefrom, or alternatively, with the intent to appropriate the property to his own use or to the use of any person not entitled thereto. *See Anthony Distribs., Inc. v. Miller Brewing Co.*, 941 F. Supp. 1567, 1575 (M.D. Fla. 1996); *Florida Standard Jury Instructions*, 720 So. 2d 1077, 1078 (Fla. 1998). Upon making this showing, a plaintiff is entitled to treble damages in addition to reasonable attorney's fees and court costs. *See* Fla. Stat. § 772.11(1). Further, "Before filing an action for damages under this section, the person claiming injury must make a written demand for $200 or the treble damage amount of the person liable for damages under this section." *Id*. The Amended Complaint states merely that "Plaintiff made demands for the return of the $13.68 million in US Dollars from the 1% advance fee of [t]he [f]raudulent [c]ontracts." ECF No. 93 ¶ 306. I do not find that statement to be sufficient to satisfy the requirements of § 772.11(1). There is no information regarding whether the demand was verbal or written. Further, it does not allege that Plaintiff requested the treble damage amount, merely the $13.68 million Plaintiff had paid into the contracts. For this reason, and others explained below, Plaintiff should not be awarded default judgment for civil theft. *See Prou v. Giarla, et al.*, No. 13-24266-CIV, 2014 WL 12621907, at *1 (S.D. Fla. June 25, 2014) (J. Graham) (denying plaintiff's motion for default judgment for civil theft where the demand letter submitted as evidence with the complaint failed to satisfy the pre-suit

demand requirements of Fla. Stat. § 772.11 by only including a demand for actual damages, not for treble damages) (citing *Ocala Jockey Club, LLC v. Rogers*, 981 So. 2d 1245, 1247 (Fla. 5th DCA 2008)).

Conversion is the wrongful exercise of dominion or control over property to the detriment of the rights of one entitled to possession. *Bel–Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998) (applying Florida law). Money may be the subject of conversion, but "it must be shown that there was exercised a positive, overt act or acts of dominion or authority adverse to the rights of the true owner." *All Cargo Transp., Inc. v. Fla. E. Coast Ry. Co.*, 355 So. 2d 178, 179 (Fla. 3d DCA 1978). Thus, in order to prevail on a common law conversion claim, a plaintiff must prove that the defendant: "(1) engaged in an unauthorized act which deprived [p]laintiff of its property permanently or for an indefinite amount of time; and (2) either (a) [p]laintiff had a right to possession of the property and demanded its return at a time when the [d]efendant had possession and the demand was not or could not be met; or (b) such a demand and refusal were unnecessary because it would have been futile." *Belleview Biltmore Partners, LLC v. Noah & Assoc.*, No. 17-20460-CV, 2018 WL 1795480, at \*5 (S.D. Fla. Mar. 13, 2018) (J. Torres) (citing *Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1291 (11th Cir. 2001) and *Senfeld v. Bank of Nova Scotia Trust Co. Ltd.*, 450 So. 2d 1157, 1161 (Fla. 3d DCA 1984)).

Plaintiff alleges that as of January 15, 2016, Defendants were obligated to return the $13.69 million, however, it "became clear that Defendants were not going to perform their contractual obligation" so Plaintiff made multiple demands for the

return of the money. ECF No. 93 ¶¶ 319–22. Defendants have yet to return that money to Plaintiff and have "concealed and withheld information related to where the $13.68 million . . . is and to provide an accounting for the monies," and instead have kept it for their own businesses. *Id*. ¶¶ 323–26.

Plaintiff should not be awarded a default judgment for civil theft or conversion because there was already a contractual relationship between the parties. There is no allegation that the conversion or civil theft is independent from Defendants' failure to comply with the contractual agreement. "This is not to say that there can never be a claim for civil theft or conversion if there is a contractual relationship between the parties;" it only means that "the civil theft or conversion must go beyond, and be independent from, a failure with comply with the terms of a contract." *See Longhi v. AMG Financial Group, Inc.*, No. 19-23047-Civ, 2020 WL 7481167, at *3 (S.D. Fla. Jan. 24, 2020) (J. Torres) (quoting *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055–56 (Fla. 3d DCA 2008), *report and recommendation adopted*, 2020 WL 7481169 (S.D. Fla. Feb. 27, 2020) (J. Williams)).

Plaintiff seeks to establish his civil theft and conversion claims for the money he and others paid in advance fees for lines of credit that were never made available. But, "[f]or money to be the object of conversion, 'there must be an obligation to keep intact or deliver the specific money in question, so that [the] money can be identified.'" *Gasparini*, 972 So. 2d at 1056 (quoting *Futch v. Head*, 511 So. 2d 314, 320 (Fla. 1st DCA 1987)); *see also Belford Trucking v. Zagar*, 243 So. 2d 646 (Fla. 4th DCA 1970). "This is generally established if the alleged wrongdoer is obligated to hold the funds

in a trust or escrow account." *Longhi*, 2020 WL 7481169, at \*3. *See, e.g., Masvidal v. Ochoa*, 505 So. 2d 555 (Fla. 3d DCA 1987) (civil theft and conversion can be asserted where a party embezzles funds from an escrow account). However, "where the parties have an open account, and the defendant is not required to pay the plaintiff identical moneys which he collected, there can be no action in tort for conversion." *Belford Trucking Co.*, 243 So. 2d at 648 (citation omitted). In other words, "[a] mere obligation to pay money may not be enforced by a conversion action." *Id.* (citation omitted).

There is nothing in the record to reflect that when Defendants received the funds from Plaintiff and the original contracting borrowers (i.e., the $13.68 million), that there were restrictions on what they could do with that money. Plaintiff alleges that Defendants had an obligation to either make available the $1.368 billion line of credit to the borrowers or reimburse the borrowers for their advanced fees. But, this cannot constitute a conversion claim "because all that it proves is that [Defendants] failed to honor [their] contractual obligation," and "[a]n indebtedness which may be discharged by the payment of money in general cannot support an action for conversion." *Schimmel v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 464 So. 2d 602, 605 (Fla. 3d DCA 1985) (citing *Belford Trucking Co.*, 243 So. 2d 646); s*ee also Capital Partners Investment Co. v. American Investment Group*, 500 So. 2d 249, 250 (Fla. 4th DCA 1987) (affirming trial court's holding that nonpayment of commissions did not constitute conversion). Therefore, Plaintiff has no claim for conversion because the Defendants "had every right to do with [the $13.68 million] as [they] pleased." *Gasparini*, 972 So. 2d at 1056.

Moreover, Plaintiff also has no claim for civil theft because "[t]o establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." *See Longhi*, 2020 WL 7481169, at *4 (citing *Gasparini*, 972 So. 2d at 1056). The reason these torts go hand in hand is because, like conversion, a civil theft claim "must go beyond, and be independent from, a failure to comply with the terms of a contract." *Heldenmuth v. Groll*, 128 So. 3d 895, 896 (Fla. 4th DCA 2013) (quoting *Gasparini*, 972 So. 2d at 1055). Because there is no allegation that Defendants' actions were independent from the underlying contractual agreement, and because Plaintiff did not allege sufficient facts to establish that he provided Defendants with the necessary written demand, Plaintiff's Motion for Default Judgment should be **DENIED** as to Counts X and XII.

### k. Count XI: Unjust Enrichment

Plaintiff is entitled to relief for unjust enrichment only in the absence of an established breach of contract claim. *See Shandong Airlines Co., Ltd. v. CAPT, LLC*, 650 F. Supp. 2d 1202, 1207 (M.D. Fla. 2009) (denying default judgment on promissory estoppel and unjust enrichment claims, "because relief on these quasi-contract claims cannot be granted once a breach of contract has been established") (citing *Doe v. Univision Television Group, Inc.*, 717 So. 2d 63, 65 (Fla. 3d DCA 1998)). However, a claim for unjust enrichment may be sustained where there is a contract if the contract does not address the benefit at issue, such that the plaintiff does not have remedy for breach of contract. *See Malamud v. Syprett*, No. 2D12–409, 2013 WL 1352474, at *4 (Fla. 2d DCA 2013).

In his unjust enrichment claim, Plaintiff alleges that Defendants were unjustly enriched in that they were able to (1) launder the $1.368 billion they were supposed to extend to Plaintiff and borrowers as a line of credit, (2) steal, misappropriate, convert, and withhold the $13.68 million in advanced fees for their own benefit, (3) earn "fees for assisting Doe Defendants launder and conceal the true origin" of the $1.368 billion, and (4) earn "other things of value." ECF No. 93 ¶ 314. A breach of contract claim has already been established for Defendants' failure to return the $13.68 million, thus, that cannot be a basis for an unjust enrichment claim. The allegation that Defendants earned "other things of value" is far too vague to support an unjust enrichment claim. Thus, we are left with the first and third alleged enrichments.

To make a claim for unjust enrichment, a plaintiff must show: (1) that plaintiff conferred a benefit on defendant; (2) that defendant has knowledge of the benefit; (3) that defendant has accepted or retained the benefit conferred; and (4) that under the circumstances it would be inequitable for defendant to retain the benefit without paying fair value for it. *Woodburn v. State of Fla. Dept. of Child. and Fam. Servs.*, 854 F. Supp. 2d 1184, 1204 (S.D. Fla. 2011). The Florida courts have not specifically defined the term "benefit" for purposes of an unjust enrichment claim. *See Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1279 (S.D. Fla. 2009). However, the benefit must be conferred directly from the plaintiff to the defendant. *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1310 (M.D. Fla. 2009); *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996).

I do not find that either of the two remaining "benefits" were conferred directly from Plaintiff to the Defendants. Nowhere in the ninety-nine page Amended Complaint does Plaintiff allege that he and the other borrowers were directly involved in providing Defendants with the $1.368 billion that was laundered, nor is it alleged that they directly provided the opportunity for Defendants to earn "fees" for laundering and "concealing the true origin" of the $1.368 billion. In fact, Plaintiff states multiple times in the Amended Complaint that he was unaware that the $1.368 billion was being laundered.

Because Plaintiff has not shown that, separate and apart from his breach of contract claim, he directly conferred a benefit on Defendants, Plaintiff's Motion for Default Judgment should be **DENIED** as to Count XI.

*l. Count XIII: Bailment*

"Under Florida law, bailment is defined as the delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be *redelivered* to the person who delivered it..." *Affiliated FM Ins. Co. v. Dependable Warehousing & Distribution, Inc.*, 303 F. Supp. 3d 1329, 1331 (S.D. Fla. 2018) (J. Moreno) (emphasis added) (citation omitted). To establish a prima facie case for bailment, a plaintiff must show "that the bailed property was delivered to the bailee in good condition and that it was damaged while it was in the care, custody, and control of [the] bailee." *Parker v. Miracle Strip Boat & Motors Headquarters, Inc.*, 341 So.2d 197, 198 (Fla. 1st DCA 1976). "The law imposes on the bailee the burden of showing that he exercised the degree of care

required by the nature of the bailment." *Clermont Marine Sales, Inc. v. Harmon*, 347 So.2d 839, 841 (Fla. 2d DCA 1977). However, a presumption of negligence arises if the bailee fails to return the property in accordance with the terms of the bailment agreement and the bailee does not or cannot satisfactorily explain such failure or the loss, damage, or disappearance of the property. *Id.*

Plaintiff alleges that under the terms of the contracts, Defendants were only authorized to retain the $13.68 million if they fulfilled their end of the contracts. If they failed to perform their contractual obligations, they were obligated to reimburse Plaintiff for the $13.68 million. ECF No. 93 ¶¶ 330–32. Plaintiff alleges that in January 2016, "when it was clear Defendants would not perform their obligations," Defendants were no longer entitled to keep those funds "since they failed to perform their contractual obligations," so he made formal demands to be reimbursed for the $13.68 million. *Id*. ¶ 333. Defendants did not reimburse Plaintiff for the $13.68 million and as a direct and proximate result, Plaintiff alleges that he suffered damages and lost business opportunities. *Id*. ¶¶ 334–35.

I do not find that the facts pled are sufficient to establish a cause of action for bailment. A key component of a bailment contract is that the bailor gives up possession of the property to bailee, but not title. The contracts as described, do not indicate that Plaintiff retained title of the $13.68 million. Instead, he and the other original borrowers paid Defendants the $13.68 million and, in effect, gave up their ownership rights to that $13.68 million *unless* Defendants failed to uphold their contractual obligations. In other words, if Defendants had fulfilled their contractual

obligations and extended the $1.368 billion line of credit to Plaintiff, then Defendants would have been entitled to keep the $13.68 million paid as an "advanced fee" for the line of credit.[6] That is not bailment. Because Plaintiff has failed to establish that he was entitled to redelivery of the advanced fees regardless of whether Defendants fulfilled their contractual obligations, Plaintiff's Motion for Default Judgment should be **DENIED** as to Count XIII.[7]

## 2. Damages [8]

As to those Counts where I have found Default Judgment should be granted, I must now determine "the amount and character of damages to be awarded" based on my own evaluation. *Isaula v. Chicago Rest. Grp., LLC*, No. 13-CV-24387, 2014 WL 3477917, at *1 (S.D. Fla. July 11, 2014) (J. King) (quoting *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999)). Plaintiff seeks damages in

---

[6] The Court also must take into consideration the fact that although Plaintiff claims he would have been entitled to a return of the $13.68 million advanced fee if Defendants did not extend the line of credit,  Plaintiff has also stated that the 1% advanced fee was "non-refundable." *See, e.g.,* ECF No. 105 ¶ 14.

[7] Plaintiff's Amended Complaint raises two more causes of action: one for "Accounting" and one for "Complaint for pure bill of discovery or pre-action discovery." ECF No. 93 ¶¶ 336–50 (Counts XIV and XV, respectively). However, Plaintiff's Motion for Default Judgment only requests entry of Default Judgment against Defendants as to Counts I–XIII. *See* ECF No. 104. Thus, Counts XIV and XV will not be addressed in this Report and Recommendation.

[8] To assess the reasonableness and validity of the amounts Plaintiff claims Defendants owe him, the Court held an evidentiary hearing. ECF No. 116. The Eleventh Circuit has stated "that judgment of default awarding cash damages could not properly be entered 'without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation.'" *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985) (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)). Plaintiff also submitted documentary evidence to support his claim for damages. *See* ECF No. 117.

the amount of $13.68 million, statutory treble damages in the amount of $41.04 million pursuant to 18 U.S.C. § 1962(c), applicable interest, and compensation for expenses and court costs in the amount of $15,864.00 (although subsequently claims he is owed $660,030 in costs). *See* ECF Nos. 104 at 2, 114 at 15. Plaintiff asserts that the Defendants contributed equally to the wrongdoings and thus are jointly and severally liable for the award of damages. ECF No. 106 at 2.

As an initial matter, Plaintiff is not entitled to treble damages because he cannot prevail on the RICO claims. Furthermore, he is not entitled to the damages claimed for Counts V (Aiding and Abetting), VII (Contract Interference), X (Civil Theft), XI (Unjust Enrichment), XII (Conversion), or XIII (Bailment) because Plaintiff is not entitled to default judgment pursuant to Rule 55(b) as to those Counts. Thus, the only damages available to him are those that stem from Count IV (Fraud), Count VI (Breach of Contract), and Count VIII (Fraudulent Inducement). For all three causes of action, Plaintiff seeks the same relief: (i) compensatory damages, "including the $13.68 million in advance fees paid, interest, lost business and other related damages in an amount to be determined by the trier of fact," (ii) "fees and costs of Court in an amount to be determined by the trier of fact," (iii) "special, exemplary and punitive damages in an amount to be determined by the trier of fact," and (iv) "any further relief this Court deems just and equitable." *See* ECF No. 93 ¶¶ 266, 279, and 294.

a. *Compensatory Damages*

Unlike a default as to liability, the allegations contained in the complaint regarding the measure of damages are not considered admissions by virtue of the default. *See Stockwire Research Group, Inc. v. Lebed*, 577 F. Supp. 2d 1262, 1263 n.2 (S.D. Fla. 2008). Rather, the plaintiff bears the burden of proving the amount of damages, which may be established either by submitting "sufficient evidence . . . to support the request for damages," or, if the documentary evidence is not sufficient, via a hearing on damages. *Wallace v. The Kiwi Group*, 247 F.R.D. 679, 681 (M.D. Fla. 2008).[9] To justify his request for compensatory damages in the amount of $13.68 million, Plaintiff submitted numerous bank invoices, letters, and receipts, many of which were not in English. ECF No. 117-5. Plaintiff also submitted declarations from Mr. Stoeckl, Mr. Owens, and Mr. Stuart. ECF No. 112. Mr. Stoeckl states in his declaration that in May 2000, he paid $1 million in advanced fees to Defendants in exchange for a $50 million line of credit. *Id.* at 2–3. He describes his personal knowledge of the fraud perpetuated on him and the other Original Borrowers, including the total moneys they paid in advanced fees ($13.68 million). *Id.* at 5–7. Mr. Stuart's declaration states that he and his partners, on behalf of Mooseberg Beratungen, paid €750,000 in advanced fees. *Id.* at 10–11. He references the $13.68

---

[9] In his Second Declaration, Plaintiff suggests that to calculate compensatory damages, the Court can simply add up the face value of the contracts listed in the Amended Complaint and then multiply that number by .01 to ascertain the 1% paid in advance fees for those contracts. I do not find that is sufficient, particularly when Plaintiff did not submit all of the contracts as evidence for this court to review. To support a request for compensatory damages, Plaintiff must submit *sufficient evidence*. *Wallace*, 247 F.R.D. at 681. Listing the contracts and their total value is not sufficient evidence. Thus, I will rely on the evidence that was submitted at ECF No. 117 to try to ascertain the amount of compensatory damages incurred by Plaintiff and the original borrowers.

million total paid in advanced fees and the fraud perpetuated on all of the borrowers, but he does not speak to any specific knowledge of the fees individual borrowers paid. *Id*. at 11–12. Finally, Mr. Owens' declaration states that in May 2000, he entered into contracts with Defendants on behalf of Mr. Drummond Hay, Balruddery Investments, and Julian Mark/Amanda Foods, for which he paid $1.3 million total in exchange for a $130 million loan. *Id*. at 16–17. Like Mr. Stoeckl, Mr. Owens also speaks to his knowledge of the other borrowers who were defrauded out of millions of dollars before assigning their contract rights to Mr. Fagan but does not state that he has personal knowledge of what each borrower paid to Defendants. *Id*. at 18–19.

As to Counts IV (Common Law Fraud) and VIII (Fraudulent Inducement), fraud claims permit a recovery of the *actual* damages occasioned as a result of the fraud. *See Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1354 (M.D. Fla. 2003) (under Florida law, the "first measure of damages" for a successful fraud claim is known as the "out-of-pocket rule," which "allows for recovery of amounts that the plaintiff actually lost."). The Amended Complaint seeks $13.68 million in compensatory damages for the advance fees paid, plus "lost business and other related damages in an amount to be determined by the trier of fact." ECF No. 93 ¶¶ 266(i), 294(a). Based on my calculations and the declarations and other evidence submitted, the evidence supports that the Original Borrowers paid the following amounts:

| Contract name/ Transaction Reference | Original Borrower | Amount Paid (in US Dollars) | Record Cite |
|---|---|---|---|

| MIOKATE | Stoeckl | 1.0M | ECF Nos. 112 at 2–3 and 117 at 58, 60 |
| ZORMAK, NIOMISA, MESABEC | Owens, Balruddery Investments, and Sean Drummund Hay | 1.3M | ECF No. 112 at 16–17 |
| FRISANT[10] | UKNOWN | 0 | No proof of payment in record |
| GLASCOW | Melville/APT Group | 0 | No proof of payment in record[11] |
| MOSAIC | Melville/APT Group | 0 | No proof of payment in record |
| APT/TTT/GKF/400 | Melville/APT Group | 1.0 M | ECF Nos. 117 at 105 and 111-1 at 93. |
| LEOMARIS | Melville/APT Group | 0 | No proof of payment in record |
| B68733601H | Melville/APT Group | 0 | No proof of payment in record |

---

[10] Because the fraud claims are not based solely on the formation of the contracts, I do not find that Plaintiff's damages should be limited only to those contracts which he has shown sufficient assignment. Thus, moneys paid for the FRISANT contract should be included in the calculation of damages for the fraud and fraudulent inducement claims, but not the breach of contract claim, as previously explained.

[11] For all of the Melville/APT Group contracts, there is only evidence of two payments (one payment of $1.0 million pursuant to the APT/TTT/GFK/400 contract and one payment of $1.0 million pursuant to the FIN/100EM/APT2/170610 contract). Although there is evidence that Melville/APT Group paid moneys to Defendants for other contracts, those contracts are not described in Plaintiff's Amended Complaint. *See, e.g.* ECF No. 11-1 at 100 (invoice for APT stating that they owe GK Finance $30,000 pursuant to contract "FIN/20MUSD/APTINT"). The Court, therefore, cannot assume fraudulent conduct on the part of Defendants and award damages for those contracts which were not referenced in the Amended Complaint.

| UO3586316729 | Melville/APT Group | 0 | No proof of payment in record[12] |
| FIN/100EM/APT2/170610 | Melville/APT Group | 1.0 M | ECF No. 117 at 121 |
| MIRIEN | Mooseberg Beratungen, Stuart | 807,707[13] | ECF No. 112 at 10–11 |
| LISETONIA | Kalchbrenner | 0 | No proof of payment in record[14] |
| **TOTAL** | | **5,107,707** | |

Plaintiff provided the Court with hundreds of pages of bank documents, some of which are not in English. After carefully reviewing these records, I have found proof of payment only for the above referenced borrowers whose contracts were assigned to Plaintiff. If they are not included in this table, it is because either (1) there was no record of payment in the evidence provided; (2) there was some proof of payment, but the payment was made to an "unknown" source; (3) a payment was made to Defendants, but it was made by an entity or person for whom Plaintiff did not claim to have been assigned the contract rights; (4) the payment receipt

---

[12] There is an invoice sent to a "Trevor A White" referencing $30,000 owed for this contract. However, there is no information about who Trevor White is or how, if at all, he is related to the contract between Mr. Melville, his company APT Group, and Defendants. The record is devoid of any information about who Mr. White is and whether he was a victim of the fraud or a participant in it. Thus, I decline to award $30,000 to Plaintiff for an invoice sent to a person about whom this Court has no information as to his involvement.

[13] €750,000 in 2004 was worth approximately 807,707 US dollars.

[14] There is evidence that Kalchbrenner paid $300,000 to someone, but the beneficiary of that $300,000 is "unknown" according to the evidence submitted. ECF No. 117 at 89.

references a contract that is not referenced in the Amended Complaint; or (5) the information provided is in German and thus unable to be interpreted by this Court. The Plaintiff bears the burden of proving the amount of damages and the Court will not act "like [a] pig, hunting for truffles" buried in evidence that, without *clear* explanation, description, or translation from Plaintiff, is confusing at best and incoherent at worst. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Thus, based on my best review of the evidence provided, I find there is sufficient evidence to support an actual loss of $5,107,707 directly resulting from Defendants' illegal activities that formed the basis for liability in Counts IV and VIII of the Amended Complaint. **I recommend the Court award Plaintiff damages for the fraud and fraudulent inducement claims in the amount of $5,107,707.**

As to Count VI (Breach of Contract), the Amended Complaint seeks $13.68 million in compensatory damages for the advance fees paid, plus "lost business and other related damages in an amount to be determined by the trier of fact." ECF No. 93 at 279(i). As previously stated, Plaintiff is only entitled to breach of contract damages that arose from the breaching of the Assigned Contracts. Based on my calculations and the evidence submitted for the Assigned Contracts only, as previously stated, the evidence supports that the Original Borrowers paid $5,107,707. However, the damages awarded for breach of contract claims are not "out of pocket" losses. In Florida, the injured party in a breach of contract action may recover damages that will put the party in the same position they would have been in had the other party not breached the contract. *Capitol Envtl. Servs., Inc. v. Earth Tech, Inc.*,

25 So. 3d 593, 596 (Fla. 1st DCA 2009). Recoverable damages are inclusive of "all damages that are causally related to the breach so long as the damages were reasonably foreseeable at the time the parties entered into the contract." *Id.*

If Defendants had not breached the Assigned Contracts, Plaintiff and the Original Borrowers would still be out $5,107,707. In other words, they were not getting their advanced fees back. They paid the fees in exchange for a loan, the remainder of which would have had to be paid back at the close of the contract period. There is little to no information provided in the Amended Complaint or Motion for Default Judgment to allow this Court to speculate as to the position Plaintiff would be in had Defendants not breached the Assigned Contracts. Plaintiff states that he would have had other business opportunities, had he had access to the $1.3 billion, and although that might be true, there is no telling how much money he would have made (or lost) as a direct result of having the $1.3 billion loan. Thus, I find it inappropriate to award damages based on the breach of contract claim because Plaintiff has not provided sufficient evidence of the position he would have been in had Defendants not breached the Assigned Contracts. Accordingly, Plaintiff's request for damages pursuant to Count VI should be **DENIED**.

  b. *Interest*

Plaintiff requests interest on the $13.68 million. ECF No. 104. He does not request a specific interest rate or specify the time period from which interest should run. Plaintiff cites nothing in the contracts nor any legal authority to support his request for interest. Accordingly, Plaintiff's request for interest should be **DENIED**.

c. *Fees and Costs*

In his Motion for Default Judgment and First Declaration, Plaintiff states that he is seeking $15,864.00 in expenses and court costs for "research, experts, filing fees, service fees, travel, copying, mailing and miscellaneous expenses." ECF Nos. 104 at 2 and 105 ¶ 42. However, in his Third Declaration Plaintiff requests not only the $15,864, but an additional $255,030.00 in costs paid and $405,000.00 in costs incurred. *See* ECF No. 114 ¶ 42(d)–(e). Plaintiff submitted as evidence with his Motion for Default Judgment a list of combined expenses and costs claimed from 2000 to present. *See* ECF No. 117-6.

Rule 54 of the Federal Rules of Civil Procedure governs the award of costs. It provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d) (1). Rule 54 does not define "costs." *See id*. However, in 28 U.S.C. § 1920, fees and expenses that may be taxed as costs include the following:

(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. Furthermore, Courts have concluded that § 1920 permits the recovery of the filing fee, photocopying fees, and service-of-process fees. See *U.S. E.E.O.C. v. W & O, Inc.*, 213 F.3d 600, 623 (11th Cir. 2000) (photocopying and service

of process fees); *Wallace v. The Kiwi Group, Inc.*, 247 F.R.D. 679,687 (M.D. Fla. 2008) (indicating that the filing fee is a recoverable cost under § 1920); *Corsair Asset Mgmt., Inc. v. Moskovitz*, 142 F.R.D. 347, 351 (N.D. Ga. 1992) (same). In reviewing the requested costs, I find only the $3,870.00 that Plaintiff spent on court fees and costs ("filing, translations, overseas service, copying, mailing") to be appropriate. Plaintiff cites no authority, nor is this Court aware of any, that would allow Plaintiff to recover the thousands of dollars spent flying himself and the Original Borrowers back and forth to Cyprus and other foreign countries between 2000 and now. Not to mention the hundreds of thousands of dollars spent in hotels, transportation, food and beverage costs, "miscellaneous expenses," etc. Without authority to grant such extensive costs, **I recommend the Court award Plaintiff only those costs allowed under 28 U.S.C. § 1920 totaling $3,870.00.**

   d.  *Punitive Damages*

     Generally, punitive damages are not recoverable for breach of contract; but, where the acts constituting a breach of contract also amount to a cause of action in tort, there may be recovery of exemplary damages upon proper allegations and proof of intentional wrong, insult, abuse, or gross negligence constituting an independent tort. *Griffith v. Shamrock Village*, Fla., 94 So. 2d 854, 858 (Fla. 1957). To recover for punitive damages in tort as an independent cause of action, in addition to breach of contract, "an intentional wrong" must be alleged. *Nicholas v. Miami Burglar Alarm Co., Inc.*, 339 So. 2d 175 (Fla. 1976). However, even when a cause of action in tort has been properly pled, Plaintiff must also demonstrate malice, moral turpitude, wantonness, or outrageousness in the commission of the tort. *Griffith*, 94 So. 2d at

854. A review of Plaintiff's Amended Complaint reveals that Plaintiff has failed to make the requisite showing of malice, moral turpitude, wantonness, or outrageousness necessary to award punitive damages. *See E&C Copiers Export Import Corp. v. Arizas Fotocopiadoras S.A.S.*, No. 15-21693-Civ, 2015 WL 7720604, at *3 (S.D. Fla. Nov. 30, 2015) (J. Cooke) (granting in part and denying in part Plaintiff's Motion for Default Judgment, but denying Plaintiff's request for punitive damages where Plaintiff made no allegations of malice, moral turpitude, wantonness, or outrageousness on the part of Defendants). Therefore, Plaintiff's request for punitive damages should be **DENIED**.

   *e. Joint and Several Liability*

   I find that all Defendants should be held jointly and severally liable for the damages incurred by Plaintiff as a result of the acts described in the Amended Complaint. Fraud (Count IV), Breach of Contract (Count VI), and Fraudulent Inducement (Count VIII) are all Florida law claims. Under Florida law, "[j]oint and several liability exists where two or more wrongdoers negligently contribute to the injury of another by their several acts, which operate concurrently, so that in effect the damages suffered are rendered inseparable." *Albertson's, Inc. v. Adams*, 473 So.2d 231, 233 (Fla. 2d DCA 1985). In a case such as this one, where Defendants each filled a defined role in an ongoing fraudulent scheme that contributed to the damages incurred by Plaintiffs, it is appropriate to impose joint and several liability.

## REPORT AND RECOMMENDATION

   Based on the foregoing, this Court **RECOMMENDS** that the District Court **GRANT** Plaintiff's Motion for Default Judgment (ECF No. 104) as to Counts IV, VI,

and VIII, **DENY** Plaintiff's Motion for Default Judgment as to Counts I–III, V, VII, IX–XIII, and award Plaintiff the following in damages:

**COMPENSATORY DAMAGES**: $5,107,707.00

**FEES AND COSTS:** $3,870.00

**TOTAL:** $5,111,577.00

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Robin Rosenberg, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2019).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE AND SUBMITTED** in Chambers this 28th day of June, 2021 at West Palm Beach in the Southern District of Florida.

BRUCE REINHART
United States Magistrate Judge